The appellant, Wayne Anthony Agee, was arrested on January 27, 1981, charged with the crime of capital murder, and placed in the Jefferson County Jail. After a preliminary hearing was held, appellant was bound over to the Jefferson County Grand Jury, where two indictments were returned, each charging appellant with capital murder. Appellant was then arraigned on those two charges on April 20, 1981.
On August 23, 1982, the appellant was tried by a jury before Circuit Judge William Cole. The jury returned a verdict of guilty as to the two indictments of capital murder on August 27, 1982. Subsequent to the announcement by the jury of their findings, the trial judge conducted a sentence hearing before the same jury. The jury then retired to consider an appropriate *Page 1198 
sentence and later announced their determination. The jury's recommendation was imprisonment without parole. The trial judge followed the jury's decision and sentenced the appellant to life in prison without parole.
The facts, as disclosed by the pleadings and trial testimony, are that on January 16, 1981, the appellant and his two co-defendants, Carnel Jackson and Jerry Stephen Godbolt, visited several parties and nightspots in the Birmingham area. Later that evening, one of the three decided to steal a car and the others complied. Mr. and Mrs. Terry Wayne Tucker were abducted by the trio as they were getting into their car after exiting a Birmingham club. It appears that Godbolt drove the seized automobile, while Jackson who was armed with a shotgun, held Mr. and Mrs. Tucker in the back seat. Godbolt and Jackson, along with their victims, drove to Godbolt's apartment. The appellant followed in his automobile. Mr. Tucker was placed in the trunk of the car at some point of the trip. Upon their arrival at the apartment, Mrs. Tucker was taken inside, where she was forced to perform fellatio on Godbolt and subsequently was raped by Jackson while appellant waited outside. Later, appellant entered the apartment and raped Mrs. Tucker. It was then decided that the Tuckers should be killed.
The Tuckers were then taken to a secluded mining road in Jefferson County. Godbolt and Jackson were with Mr. and Mrs. Tucker in their automobile, while the appellant followed in his vehicle. Jackson instructed the appellant to stay in his car and then proceeded to shoot and kill both Mr. and Mrs. Tucker. The trio then drove back to Birmingham and visited a night club. After a short stay at the club, the appellant drove home and was later apprehended for questioning on January 21, 1981, and arrested on January 27, 1981.
Appellant's second statement, and its admissibility and validity, will be dealt with first so as to avoid any possible conflict in this decision. Our decision as to the admissibility of the first statement is dependent on our ruling on the second statement's admissibility.
In order for us to decide whether the trial court erred in allowing the admission of appellant's second statement, in which he confessed to his commission of a crime after having been told by law enforcement officers that he would be a witness in the case against his two co-defendants, we must first decide whether a statement by law enforcement officials requesting a particular individual to serve as a witness in a case is a promise of hope or reward for cooperation and information; we must also decide whether, after such a request is made, any subsequent statements or confessions by the "witness" are considered to be voluntarily and intelligently given.
While it is true that any promise or inducement, however slight, either direct or implied, will render a confession involuntary, Eakes v. State, 387 So.2d 855 (Ala.Crim.App. 1978), the test that must be applied in determining the voluntariness of a confessor's statements is whether the confessor's will was overborne at the time he confessed. Greenv. State, 439 So.2d 816 (Ala.Crim.App. 1983); Minor v. State,437 So.2d 651 (Ala.Crim.App. 1983); Townsend v. Sain,372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Elliott v. State,338 So.2d 483 (Ala.Crim.App. 1976). An examination of all "attendant circumstances" is the proper method for conducting a test of the voluntary nature of a confession. Boulder v.Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969);Wallace v. State, 290 Ala. 201, 275 So.2d 634 (1973); Bennettv. State, 409 So.2d 936 (Ala.Crim.App. 1981).
We must look at the facts of this case to determine whether appellant's second statement was voluntary. He was brought in on January 21, 1981, for questioning regarding the two murders. At that time he made a statement concerning both his and his co-defendants' activities on the night of the crime. Appellant made no incriminating statements, even though he was repeatedly questioned about the rape, robbery, and murder. At the conclusion of *Page 1199 
the first questioning, the law enforcement officers asked appellant if he would be willing to return for further questioning and perhaps serve as a witness at his co-defendant's trial. The appellant responded that he was willing to cooperate. Homicide Investigator Sergeant James E. Gay of the Birmingham Police Department testified, at a hearing on appellant's motion to suppress his statements, that, at the time he asked appellant if he would be a witness, no information at that point in time implicated the appellant and therefore the officers' statement to the appellant of his witness status was an honest representation.
On January 27, 1981, appellant was asked to return to the police station for further questioning. Appellant was again read his Miranda rights before any questioning commenced. No representations were made to the appellant at this time as to his status as a witness or as a suspect. The officers once again questioned the appellant as to his observations and involvement the night of the crime. Due to other information the officers had received, they considered the appellant more involved than they had originally. During this second questioning of the appellant, he admitted that he raped Mrs. Tucker. The officers then placed appellant under arrest.
We are not persuaded by appellant's argument that the officers' initial request that appellant serve as a witness amounted to any type promise of immunity from prosecution for any crimes that he may have committed. Appellant relies onCommonwealth v. Peters, 473 Pa. 72, 373 A.2d 1055 (1977), as authority for his contentions. However, Peters, supra, while not controlling for this court, is distinguishable from the present case. In Peters, supra, the police interviewed the defendant at a time when he was not a suspect. The defendant was released and the investigation continued until Peters was once again questioned. Prior to this second questioning, the police had told Peters that the most that would happen to him if he provided information "would be that he would be picked up or held as a material witness on dollar bail." While giving his second statement, Peters made a confession to the crime of rape and was thereafter arrested. The court in Peters, supra, held that the officers' statement "promised immunity to Peters by implying he would not be prosecuted."
The record of the case at bar does not reflect any language by law enforcement which in response promised the appellant broad exemption from prosecution if he would testify against his co-defendants, a fact which is unlike Peters, supra, where the defendant was promised immunity from prosecution for information.
In Mayberry v. State, 419 So.2d 262 (Ala.Crim.App. 1982), this court, in an opinion by Judge John DeCarlo, dealt with the issue of immunity from prosecution. While the facts inMayberry, supra, are unlike those in the case at bar, the representations made to defendant Mayberry are quite similar to the representations that the appellant here argues were made to him. Reading from Mayberry, supra, we find:
 "Appellant argues that the State should have been estopped to indict him because he was induced to give incriminating grand jury testimony by the district attorney's promise not to prosecute him. Appellant claims the promise not to prosecute was implicit in the following pre-indictment statements made to him by the district attorney:
 `You [appellant] are either going to be a defendant or a witness.'
`We're not after you; we're after McLemore.'
 `If [you] quit playing games with us about the whores that were furnished to McLemore, [then you] could be a witness for the State.'
 "The State did not deny that the above statements were made. It contended, however, that the comments were not offers of immunity and did not work an estoppel because appellant did not rely on them in deciding to testify. The State points out that appellant appeared before the grand jury only after Miranda warnings and advice of counsel; his decision *Page 1200 
to testify was not therefore prompted by his reliance on the claimed promise not to prosecute. . . .
 "In the present case, we do not find that the district attorney's remarks amounted to an unambiguous offer of immunity or, taken in light of subsequent Miranda warnings to the appellant, could have prompted any reliance that appellant would not be prosecuted. We therefore hold that the State was not estopped to indict or prosecute the appellant."
419 So.2d at 265-66.
As stated earlier, nothing related to the appellant by the law enforcement officers may be construed as a promise by them not to prosecute him if he assisted with the investigation.
Furthermore, the appellant states that the word "key" was used by the law enforcement officers in reference to appellant's status as a witness when the officers were questioned by the news media. However, the officers testified that the probability of their using the word "key" was highly unlikely. Even if the officers did relate to the news media that they expected to use appellant as a key witness, the appellant should not be allowed to rely on the news media reports in determining what representations he believed the law enforcement officers actually made to him. To allow this would open the proverbial Pandora's box. Besides, the testimony of the reporter at the hearing on the motion to suppress the appellant's statements was that the word "key" may not have in fact been communicated to him by the officers.
The decision in Peters, supra, actually turned on the state's failure to carry its burden of proof in showing that the defendant voluntarily waived his constitutional rights. In the case at bar, the trial court heard extensive testimony at the appellant's statement suppression hearing regarding appellant's waiver of his constitutional rights. By allowing the admission of the statements into evidence, the court found that the waiver was freely and voluntarily given. While there may be some testimony contrary to the voluntariness of appellant's statements, "if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the trial court's ruling as to voluntariness of a confession need only be supported by substantial evidence and not to a moral certainty." Collier v. State, 413 So.2d 396
(Ala.Crim.App. 1981); Bennett v. State, supra; Taylor v. State,361 So.2d 1189 (Ala.Crim.App. 1978); McNair v. State,50 Ala. App. 565, 280 So.2d 171, cert. denied, 291 Ala. 789,280 So.2d 177 (1973).
Moreover, this court has held that when a trial court, after a hearing, has found that a confession or statement was given voluntarily, and where before the confession the confessor had been fully apprised of his constitutional rights under Mirandav. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and where the trial court has heard the testimony of the witnesses outside the presence and hearing of the jury regarding the confessor's constitutional rights, and where a proper predicate was laid as to the confessor's voluntariness, then this court will not disturb the findings of the trial court; unless, this court finds the decision of the trial court palpably contrary to the weight of the evidence. Whether a confession or inculpatory statement was knowingly and voluntarily made is a question of law and a proper determination for the trial judge. The standard by which the trial judge should base his decision as to the voluntariness of a confessor's statement is "a preponderance of the evidence."Cole v. State, 443 So.2d 1386 (Ala.Crim.App. 1983); Womack v.State, 435 So.2d 754 (Ala.Cr.App. 1983); Ex parte Womack,435 So.2d 766 (Ala. 1983); Raines v. State, 428 So.2d 206
(Ala.Crim.App. 1983); Hale v. State, 420 So.2d 821
(Ala.Crim.App. 1982); Bennett v. State, supra; Dejnozka v.State, 397 So.2d 240 (Ala.Crim.App.), cert. denied,397 So.2d 246 (Ala. 1981), Baldwin v. State, 372 So.2d 26 (Ala.Crim.App. 1978); Jones v. State, 292 Ala. 126, 290 So.2d 165 (1974);Hegmon v. State, 50 Ala. App. 486, 280 So.2d 192 (1973); Rudolphv. State, 275 Ala. 115, *Page 1201 152 So.2d 662 (1963), cert. denied, 375 U.S. 889, 84 S.Ct. 155,11 L.Ed.2d 119, (1963), rehearing denied 375 U.S. 917,84 S.Ct. 204, 11 L.Ed.2d 158 (1963).
Appellant also argues that his first statement, made subsequent to a supposedly illegal arrest on January 21, 1981, was tainted and therefore should not have been admitted at trial.
Assuming, arguendo, that the appellant's first statement should have been excluded as having been tainted, the trial court did not commit reversible error by allowing its admission, since appellant made a second statement on January 27, 1981, which was, as appellant's counsel espoused, "in essence . . . the same" as the previous statement. This second statement was presented to the jury for their consideration.Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1
(1972). Moreover, this court has held:
 "Where there is one confession by a defendant properly admitted into evidence and there was strong corroborative evidence of the guilt of the defendant, the admission of another confession, even though it should have been excluded upon objection, is harmless error." Kelley v. State, 366 So.2d 1145, at 1150 (Ala.Crim.App. 1979).
Therefore, appellant was not prejudiced by the admission of his first statement.
Third, appellant contends that the court erred in allowing a prospective juror to be excluded from the jury venire, since the United States Supreme Court has held that a venireperson cannot be excluded for cause unless he or she would automatically vote against the imposition of death no matter what the evidence revealed.
In support of this proposition the appellant citesWitherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770,20 L.Ed.2d 776 (1968). However, this court has held thatWitherspoon, supra, is not applicable in instances where the defendant/appellant has been sentenced to life without parole rather than death. In Davis v. State, 440 So.2d 1191
(Ala.Crim.App. 1983), we adhered to the holding of the Alabama Supreme Court's decision of Eady v. State, 284 Ala. 327,224 So.2d 876 (1969), which stated:
 "The holding in Witherspoon is not applicable where the jury recommends a sentence less than the death sentence. Bumper v. State of North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 [(1968)]. By its express terms, Witherspoon is limited to those cases where the death sentence is imposed by a jury from which some have been removed because they opposed capital punishment." See also Clark v. State, 451 So.2d 368 (Ala.Crim.App. 1984).
Therefore, reversible error did not occur when the trial judge overruled the appellant's objection, under Witherspoon, for the excusal of venireperson Beverly Russell due to her views on capital punishment.
Appellant further contends that excusing venirepersons who are unwilling to consider a death sentence at the penalty stage from serving as jurors at the guilt stage of a capital trial seriously prejudiced his right to a fair and impartial jury at the guilt stage of his judicial process. The appellant goes on to assert that, in instances where the jury convicts the accused and the case advances to the penalty stage of the proceedings, then a second jury should be empaneled, within the death qualification limits of Witherspoon, if the prosecution so elects, to decide the penalty of the one convicted.
We have held that an accused is not necessarily prejudiced by the practice of qualifying the jurors pursuant to Witherspoon
requirements. Appellant's contention that the Witherspoon jury qualification process produces a jury that is conviction-prone and therefore does not adequately represent a cross-section of the community has been previously decided by this court in the negative. Clark, supra. We affirmatively rejected the contention that death-qualified jurors are conviction-prone inMcGinnis v. State, 382 So.2d 605 (Ala.Crim.App. 1979), cert. denied, 382 So.2d 609 (Ala. 1980). *Page 1202 
As to the issue of empaneling a second jury for the purpose of determining the sentence of one convicted, Taylor v. State,442 So.2d 128 (Ala.Crim.App. 1983), held:
 "[t]he the state has a reasonable interest in avoiding the delay and confusion which would result from death qualifying a jury after the guilt stage and prior to the sentencing stage. Because, under appellant's proposal, some of the guilt-phase jurors might have to be removed on Witherspoon grounds, the sentencing-phase jurors who replaced them would not have heard the evidence admitted during the guilt phase. The repetitive and disoriented proof which might ensue would be intolerable. We therefore find appellant's argument untenable."
442 So.2d at 131.
For the foregoing reasons, appellant's contention is indefensible.
Appellant maintains that the trial court also erred in ruling that Alabama's new Death Penalty Act did not operate as a repeal of the previous death statute, namely Section 13A-5-30, et seq., Code of Alabama, 1975.
This issue has been settled by our court in Watkins v. State,409 So.2d 901 (Ala.Crim.App. 1981). There we held that the new death penalty statute (Act. No. 81-178, Acts of Alabama 1981) did not repeal the old statute (Code of Alabama, 1975, §13A-5-30 through § 13A-5-38) as to offenses occurring prior to the effective date of Act No. 81-178, the new death penalty statute. See also Phillips v. State, 443 So.2d 1328
(Ala.Crim.App. 1983).
Furthermore, Watkins, supra, also addressed the issue of the new death statute meeting constitutional requirements although the title to the statute did not fully quality reference to repealing the old statute:
 "The fact that the title to Act No. 81-178 did not fully qualify the reference to repealing the old statute does not render the act unconstitutional per art. IV., § 45, Constitution of Ala. 1901. That constitutional provision requiring that the subject of an act `shall be clearly expressed in its title' does not mean that the title is to be a complete index and detailed catalog of every clause, section or provision in the act relating to its subject. Alldredge v. Dunlap, 240 Ala. 27, 197 So. 36 (1940); Salmon v. Birmingham Parking Authority, 294 Ala. 226, 314 So.2d 687 (1975). In Opinion of the Justices, 262 Ala. 345, 349, 81 So.2d 277, 281 (1955), our supreme court stated:
 "`It is sufficient to say that the title of an act need not be an index to it nor need it catalogue all powers intended to be bestowed. When the subject is expressed in the title in general terms, everything which is necessary to make a complete enactment in regard to it, or which results as a complement of the thought contained in general expression, is is included in and authorized by it. . . .'
 "The single subject of Act No. 81-178, supra, is the establishment of new capital felony offenses in Alabama. All other provisions of the act concerning punishment, procedure, effective date and repealer relate to that single subject. Knight v. West Alabama Environmental Improvement Authority, 287 Ala. 15, 246 So.2d 903 (1971)."
Watkins, supra, at 903.
Accordingly, the trial court was correct in ruling that sections 13A-5-30 through 13A-5-38 applied to the appellant.
Lastly, appellant claims that the trial court erred in ruling that the circuit court sitting in Birmingham had jurisdiction over this case rather than the Bessemer Division.
Appellant argues that the Bessemer Court Act of 1919, 1919 Ala. Local Acts 62, No. 213 (August 18, 1919), (Local Laws of Jefferson County, Sections 950-957, page 320) gave the Bessemer Division of the Jefferson County Circuit Court exclusive jurisdiction over matters arising in the Bessemer Division and excluded those matters occurring in the Birmingham Division. Such an argument must be scrutinized and *Page 1203 
interpreted to coincide with the true intent of the legislature in adopting the Bessemer court legislation.
Section 12-1-3 of the Code of Alabama, 1975, reads:
 "The criminal jurisdiction of this state is vested in the circuit courts, district and municipal courts and such officers as are by law clothed with criminal jurisdiction. (Code 1852, § 380; Code 1867, § 3928; Code 1876, § 4626; Code 1886, § 4193; Code 1896, § 4589; Code 1907, § 6692; Code 1923, § 3797; Code 1940, T. 13, § 8.)"
This statute, as stated, vests criminal jurisdiction in the circuit courts of Alabama. Jurisdiction is a term of expansive scope. Its comprehensive impact defines the power of courts and judicatories. Every sort of judicial action, suit, petition, complaint, indictment or other proceeding is embraced within its range of application. It includes the power to inquire into facts, to apply the law, to make decisions and to declare judgments. While a variety of meanings have been accorded to the term jurisdiction, modern jurisprudence mandates that it should not be used in reference to the proper locality of an action. Paige v. Sinclair, 237 Mass. 482, 130 N.E. 177 (1921). See also 22 C.J.S. Criminal Law, § 107 (1961).
The 1919 Bessemer court legislation referred to each division of the Jefferson County Circuit Court as having exclusive jurisdiction over matters that occurred within its respective geographical boundaries. However, it is our opinion that the Legislature intended that the Bessemer legislation should serve the purpose of what has become known as a venue act and inserted the word "jurisdiction" for "venue". Venue relates to the territorial area within a state or district. Dealing with geographical subdivisions and determining the proper situs of a particular suit are the appropriate applications of the concept of venue, which is what the Bessemer court legislation attempted to accomplish. See Redwing Carriers, Inc. v. Foster,382 So.2d 554 (Ala. 1980). Also see 22 C.J.S. Criminal Law § 173 (1961).
All the circuit courts in the State of Alabama have jurisdiction of this criminal proceeding. However, only one, with possible exceptions as to the need for change of venue, is the proper place for bringing the suit. Only one has proper venue.
Recently, the Alabama Supreme Court, in an opinion by Justice Janie Shores, acknowledged that confusion exists as to the terms "venue" and "jurisdiction" and their appropriate meanings. The opinion went on to state that "the Bessemer Cutoff legislation does not diminish the general jurisdiction of other circuit courts, either in Jefferson or other counties." Glenn v. Wilson, 455 So.2d 2 (1984).
Earlier Alabama Supreme Court cases held that general venue rules did not apply to the venue of civil cases in the circuit court of the Bessemer cutoff. However, Glenn v. Wilson, supra, suggests that such a proposition is no longer true. The court in Glenn v. Wilson, supra, stated that cases improperly filed in either division may be transferred to the proper division or the transfer may be waived "just as in a suit filed in some other county the parties may waive claims of improper venue."
The legislature recognized that possible conflicts might occur as to the proper venue in instances where a crime is committed so near county lines that it is impossible to determine the appropriate county in which to bring the action. Therefore, the legislature developed statutes to avoid miscarriages of justice due to the uncertainty of a crime site. Section 15-2-7, Code of Alabama, 1975, alleviates any "close call" venue problems. That section reads:
 "When an offense is committed on the boundary of two or more counties or within a quarter of a mile thereof or when it is committed so near the boundary of two counties as to render it doubtful in which the offense was committed, venue is in either county. (Code 1852, § 397; Code 1867, § 3945; Code 1876, § 4636; Code 1886, § 3720; Code 1896, *Page 1204 
§ 4972, Code 1907, § 7229; Code 1923, § 4895; Code 1940, T. 15, § 95.)"
It can only be concluded that the sole intent of the legislature in passing the aforementioned code section was to obviate the problem or issue that now is before this court. Prosecutors and law enforcement officials should not be required to have geographical surveys conducted simply to determine the proper district in which to bring a cause of action when a crime is committed so near district lines that it is impractical to determine the exact, proper district.
This court also has studied the legislative history of the above statute. All previous Alabama Codes from 1876 to 1940 read:
 "When an offense is committed on the boundary of two or more counties or within a quarter of a mile thereof or when it is committed so near the boundary of two counties as to render it doubtful in which the offense was committed, jurisdiction is in either county." (emphasis added)
The above section is but another example of the Legislature's interchangeable use of the two terms jurisdiction and venue. Similarly, in Lambert v. State, 48 Ala. App. 600, 266 So.2d 812
(1972) this court stated "We have a statute governing venue. . . ." The statute referred to was then-Title 15, Section 94, Code of Alabama 1940, which read:
 "When an offense is committed partly in one county and partly in another, or the acts, or effects thereof, constituting, or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county."
The above section is now codified in the 1975 Code of Alabama as § 15-2-6. The only difference in the language is that the term "venue" is substituted for "jurisdiction". The statute is applicable in the case at bar, since the abduction of the Tuckers, and the rape of Mrs. Tucker both occurred within the Birmingham division of Jefferson County, and the culmination of the appellant's "night of crime," the murder of Mr. and Mrs. Tucker, possibly occurred in the Bessemer division.
We are convinced that, in criminal actions, the Bessemer court legislation should be read as venue legislation and the two divisions treated as if two separate counties existed. SeeShell v. State, 2 Ala. App. 207, 56 So. 39 (1911). Therefore, in the present cause, the aforementioned code sections 15-2-6 and15-2-7 would be applicable, and the present action could have been properly brought in either division.
Thus, in the case at bar, the action was properly heard in the Birmingham division, and no reversible error occurred as a result of the Birmingham division of the Tenth Judicial Circuit trying the appellant in this case.
However, above and beyond the suprapositioned affirmation, a search of the record reveals that, at appellant's trial, Coroner Joe Canoy, of the Jefferson County Coroner-Medical Examiner's Office, testified on direct examination by the State as follows:
 "Q. This place where the bodies were found, is that in Birmingham, Jefferson County, Alabama?
"A. Yes sir, it was."
Therefore, the State affirmatively offered evidence indicating where the crime of murder was committed. When the State offers evidence tending to show that the crime was committed within the jurisdiction of the court, the question of venue then becomes one for the jury to decide. Willcutt v.State, 284 Ala. 547, 226 So.2d 328 (1969); Grace v. State,369 So.2d 318 (Ala.Crim.App. 1979); Gipson v. State, 375 So.2d 504
(Ala.Crim.App. 1978). The jury has the option of believing or not believing a witness who testifies as to venue. Apparently the jury believed the witness in the present action, and, therefore, no error existed as to the venue/jurisdiction issue presented by appellant.
We have carefully searched the record for any errors that might have affected the appellant's substantial rights and have *Page 1205 
found none. Therefore, the decision of the trial court is due to be affirmed.
AFFIRMED.
All the Judges concur.